### In re LAING et al.

(Circuit Court, S. D. West Virginia. December 12, 1903.)

**1. FEDERAL COURTS—OFFICERS—INDICTMENT—HABEAS CORPUS.**

Where officers of a federal court were indicted by a state court for homicide in killing a prisoner they were seeking to arrest at the command of the United States marshal, the federal court had jurisdiction of a writ of habeas corpus to determine whether they were not unlawfully restrained of their liberty.

**2. SAME—ARREST—KILLING ACCUSED—EVIDENCE.**

During a strike, federal injunctions had been issued against the strikers, which had been uniformly disobeyed by deceased and others, and process had been issued for their arrest. Deceased on two occasions had resisted arrest with firearms, and had stated that he would never be taken alive, and did not intend to be arrested. Indictments having been returned against deceased, a United States marshal warned petitioners to assist in arresting him, and, after his house was surrounded, deceased ran therefrom with a revolver in his hand, which he pointed towards petitioners, and they, after calling to deceased to halt, and while he was approaching a tree which they believed he intended to use as a shelter to fire at them, shot deceased and killed him, for which they were indicted by the state court. *Held*, that such facts did not show an abuse of process, but justifiable homicide, and that petitioners were therefore entitled to release on habeas corpus.

Upon a Petition for Habeas Corpus.

G. W. Atkinson, U. S. Dist. Atty., William R. Thompson, J. W. St. Clair, and William McGinnis, for petitioners.

Romeo H. Freer, Atty. Gen., Samuel C. Burdett, and T. J. McGinnis, for the State of West Virginia.

JACKSON, District Judge. This case is now before the court upon the petitions of John Laing and Stewart Hurt, alleging that they were illegally and unlawfully restrained of their liberty by confinement in the county jail of Raleigh county upon an indictment for murder.

¶ 1. Jurisdiction of federal courts in habeas corpus proceedings, see note to In re Huse, 25 C. C. A. 4.

Upon this petition being presented to the judge of the Circuit Court of the United States for the Southern District of West Virginia, a writ of habeas corpus was awarded, requiring the petitioners to be brought before the court. It is proper, in considering this case, to go some little into the details of the circumstances that surrounded the parties, who were charged with the murder of one John Harless, that we may have a clear conception of all the facts and circumstances surrounding the transaction at the time that it is alleged that Harless was killed by Laing and Hurt. The evidence discloses that in the winter and spring of 1903 an extensive "strike" prevailed throughout all the coal operations on New river, of which the operations on Piney creek were a part; that Laing was a coal operator on Piney creek; that Hurt was in his employ. It also appears that an injunction had been sued out from the circuit court of the United States for the Southern District of West Virginia by the Chesapeake & Ohio Coal Agency Company against a large number of persons engaged in the strike, and that an order was granted by the court restraining and inhibiting the parties engaged in the strike from in any wise interfering with the property of the operators, and also restraining them from interfering with the miners employed and engaged in operating the mines. It seems that no attention was paid to these injunctions by the parties who were restrained and inhibited from interfering with the operations of the coal miners, and, regardless of their duties as good citizens, and in open and flagrant violation of the law, they disregarded the injunction, and continued, by their open and flagrant actions, to disregard the law, and set at defiance the orders of the court. Thereupon an application was made to the court for rules and attachments against some 60 persons, who had been restrained by injunctions, for a violation of them. The court granted the application, and process of arrest was issued against some 30 or more persons, which were placed in the hands of D. W. Cunningham, a deputy United States marshal, commanding him to arrest the parties. On the 21st day of February, Cunningham, with some four or five men he had summoned as a posse to aid him, went to Atkinsville to execute the writs in his hands, where he was met by about 200 men, most of them being armed with deadly weapons. One shot was fired close to Cunningham, and immediately in his rear, by Burton Harper, who was one of the parties resisting the officers. About this time Cunningham was surrounded by about 25 armed men, who notified him to leave, that they would give him five minutes to get away, remarking "that the time was about up." Cunningham then returned to Charleston, and reported what had occurred to Marshal Thompson, his chief. On the 25th day of February following, Cunningham went to Stanaford City to execute the same process he had attempted to execute at Atkinsville, and summoned about 80 men as a posse to aid him in the execution of them. Cunningham had been informed before he went to Stanaford City that there were about 200 armed men who would attempt to resist the execution of the writs in his hands. When he arrived at Stanaford City he found about that number there scattered around the town for the purpose of resisting him in the execution of the

writs in his hands. Cunningham arrived about midnight of the 24th at Lanark, opposite Stanaford City, the two places being separated by a small stream. On the morning of the 25th, Cunningham attempted to execute the writs in his hands, when a fight took place between him and the posse and the armed men who resisted him in the execution of the writs. In this conflict between the officers and the mob, 5 of the mob were killed, and some 20 of them wounded. There were 3 of the posse wounded, and about 20 of them had holes shot through their clothes. Cunningham succeeded upon this occasion in arresting about 60 of the persons who were resisting him. After this fight Cunningham returned to Charleston and reported what had occurred to the marshal and to the District Attorney, who afterwards advised with Judge Kellar, the judge of this district. The judge, upon learning what had occurred at Stanaford, called a special term of his court, and had a grand jury summoned to investigate the Stanaford fight and riot. As a result of the investigation, there were over 100 men indicted for resisting the officers at Atkinsville and Stanaford City, at which time John Harless was indicted in two separate cases. The court, upon the 19th day of March following, ordered capiases upon these indictments for the arrest of John Harless and others, returnable to the June term of the court. On the 21st day of April, 1903, Marshals Cunningham and Summers, armed with the process of the court, went to Stanaford City for the purpose of arresting Harless. The evidence discloses that the marshals knew, when they went to make the arrest of Harless, that they had a desperate man to deal with, who had stated that he did not intend to be taken alive, and never intended to be arrested. He was seen by the officers both at Atkinsville and Stanaford City, and aided the mob at both places in resisting the officers in the execution of the process in their hands. As a necessary precaution, they summoned Laing and Hurt to aid them in making this arrest. The marshals seemed to think that when Harless saw that he was overpowered by four men he would likely surrender, and an additional reason for summoning aid to assist them was to try to prevent, if possible, the effusion of blood. That the officers in the execution of this process had a well-grounded apprehension of trouble is borne out by events that occurred in attempting to make the arrest. Cunningham, who was the chief officer in charge, took a position in front of the house in which Harless was supposed to be, anticipating that, if he undertook to escape when he went into the house, Harless would leave the house in the opposite direction from where he stood. He placed the petitioners some little distance in the rear of the house, on a little ravine which skirted a narrow bottom, through which Harless, if he attempted to make his escape, would likely run, and he placed Summers, the other deputy marshal, about 200 yards distant from the petitioners, a little to the left of them as they went up the creek. The development of the facts sustained Cunningham in his foresight and judgment as to what would occur when he entered the house to arrest Harless. The evidence discloses the fact that a female occupant of the house discovered Cunningham approaching the house, her attention being called to the fact by the barking of a dog at the ap-

proach of Cunningham. As soon as Harless was informed that Cunningham was approaching the house, he made his escape from the opposite side of the house, armed with a pistol, and ran toward the position where the petitioners were stationed to intercept him in the event that he undertook to make his escape in that direction. After Harless left the house he ran toward Laing and Hurt, and does not seem to have observed them until he came to within a short distance of them, when he was called upon by them to "halt." He disregarded the call of the officers and continued to run, suddenly changing his direction toward a large pine tree which was close by, and which the officers thought he was making an effort to reach in order to protect himself and to open fire upon them from behind the tree. Before the officers fired they saw in his hand a pistol, which was raised in a threatening manner, and which the officers believed he was about to use and fire upon them. At this point they fired at him, but did not seem to have touched him, but just before he reached the tree that they presumed he was going to shelter himself behind they fired again, which seems to have proved fatal, though he ran for some distance afterward beyond the tree to the place where he was found dead. When the officers saw that he had got beyond the tree, after the second fire, they supposed that they had not hit him, and did not fire again. Upon his death being discovered by the officers, they telegraphed to the local authorities of the county. And thereupon the local authorities of the county investigated the matter, and the result of the investigation was an indictment in the circuit court of Raleigh county, found at the April term, 1903, against Laing and Hurt for murder. The petitioners were arrested, and lodged in the jail of the county. And thereupon they filed their petition in the Circuit Court of the United States for a writ of habeas corpus, praying for their discharge from imprisonment.

The writ was issued, and the petitioners were brought before the court for a hearing upon the facts set up in the petition. The right and power to award the writ upon the petition is not denied. It is and has long been settled law that the courts of the United States, in cases of this character, and notably in Re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, and several subsequent decisions, will award their writs to bring the parties before them, where they are confined in jail under some judicial proceedings of the state, to determine whether or not the parties should be released from further imprisonment. In re Quarles, 158 U. S. 532, 15 Sup. Ct. 959, 39 L. Ed. 1080; In re Burrus, 136 U. S. 590, 10 Sup. Ct. 850, 34 L. Ed. 1500; Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429; Virginia v. Paul, 148 U. S. 114, 13 Sup. Ct. 536, 37 L. Ed. 386; Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648; Storti v. Massachusetts, 183 U. S. 138, 22 Sup. Ct. 72, 46 L. Ed. 120. It is incident to the power of every court, both federal and state, to see that their officers are properly protected in the execution of the writs that emanate from their courts; for this reason courts of the United States will in every case, upon the proper petition presented to them, inquire into the cause of the detention of their officers by any judicial process emanating from a state court. It is in the exercise of this power that the petitioners

are before the court to-day. It follows, from what we have said, that this court has jurisdiction to determine whether or not the petitioners are entitled to a discharge from their further detention under the indictment in the state court.

This brings me to the consideration of the only other question involved in this case, and that is whether, under the facts and circumstances surrounding the officers in the execution of the process of the court, they so conducted themselves as not to make them amenable to the prosecution in the state court. It is claimed by the prosecution that the officers acted in this case with undue haste, and that it was not necessary for their protection to have fired their guns and shot at Harless in their attempt to effect his arrest. The court, in considering this view of the case, must look to all of the surrounding circumstances to determine whether the action upon the part of the officers was unwarranted, or whether they had reasonable grounds to believe that the action they took was necessary to save their lives or protect them from great bodily harm. The presumption is that they did only what was necessary to accomplish his arrest, but, of course, this presumption can be overthrown by evidence which would tend to prove a malicious murder on their part. It is well settled that if petitioners were there in the discharge of a public duty imposed upon them by the laws of the land, and that they had been summoned by the marshal as a posse to aid in the arrest of Harless, who was resisting arrest, and who threatened that he would never be taken alive, then, in the absence of all malice upon their part, they would be justified in their action. In this case there is not only an absence of malice upon the part of the officers, but there seems to have been no motive other than a desire to discharge the duty imposed upon them by reason of the fact that they had been called upon to aid the marshal in the execution of the writs in his hands against the defendant, who, when called upon by the petitioners two or three times to "halt!" and submit to arrest, paid no attention whatever to the commands of the officers, but apparently assumed a hostile position, with a gun in his hand, which he exhibited in a threatening manner, and which they supposed was about to be discharged at them. The petitioners were armed with the process of the court, attempting to execute it for the purpose of enforcing the law against Harless; while he was resisting his arrest, not only by flight, but being armed with a deadly weapon pointed in the direction of the officers, either for the purpose of a menace to them, or with the intention, if it became necessary in his opinion, to use the weapon to slay the officers who were in pursuit of him, rather than submit to arrest. This is inferable from the conduct of Harless; it is fairly inferable from his resisting the officers upon two previous occasions. Supra. It is fairly inferable from the fact that he stated upon various occasions that he "did not intend to be taken alive, and never intended to be arrested." That Harless was a criminal, and evading the officers of the law, cannot be denied. The offense with which he was charged was a grave one, and if, upon trial, he was convicted, his punishment would most likely be confinement in the penitentiary. But counsel for the state suggest and insist that the process the marshal had for the arrest of Harless was

not for a felony, and that he and his posse were guilty of a great want of discretion and abuse of power. I cannot concur with counsel in this position. Harless and his confederates had resisted the marshal in his efforts to execute process on two previous occasions. As we have seen, he was present at Atkinsville and Stanaford, armed and resisting the officers in the discharge of their duties under the law. In the view I take of the case, it was immaterial what the character of the process of arrest was. The process commanded the marshal to take the body of Harless. The moment he offered resistance and refused to be arrested, he not only put his own life in peril, but the lives of the officers also. If an officer of the law, armed with the process of the court, when he undertakes to execute it, is to be prevented from the discharge of his duty by threats of violence and a resort to deadly weapons, then it would be useless for the courts to issue process and command the arrest of any one for any cause whatever. At the time Harless was killed he stood indicted in two cases, under section 5398 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3655], for resisting officers at Atkinsville and Stanaford City, and if he was convicted under those indictments the court would have imprisoned him 12 months and fined him $300 in each case. The officers, at the time of his death, were attempting to arrest him to answer these two indictments. The evidence discloses that he made an overt demonstration of violence sufficient to justify the officers in the belief that their lives were in danger, and that they were exposed to great bodily harm. The court in this case must look at all of the facts and circumstances, and must pass upon the weight and effect of the evidence, and determine whether the circumstances by which the officers were surrounded justified their actions because of their reasonable apprehension of danger. The evidence is clear and convincing upon this point, and, if they had reason to believe that their lives were in peril, the first law of nature—the one of self-protection—would furnish an excuse for their actions. I do not conceive that it is necessary for me to furnish any authority in support of this position. Numerous decisions could be cited to sustain the court in its conclusion. In 1st Hawkins, P. C., p. 81, § 11, he states the rule of law to be:

"That if a person having actually committed a felony will not suffer himself to be arrested, but stand on his own defense or fly. so that he cannot possibly be apprehended alive by those who pursue him, whether private persons or public officers, with or without a warrant from a magistrate, he may be lawfully slain by them."

This principle, as announced by Hawkins, has been held to be law in this country. In the case of the State v. Garrett, 60 N. C. 144, 84 Am. Dec. 359, the court upon that occasion, after full and elaborate discussions and a review of all the authorities, reached the conclusion that the process must be executed and the law vindicated, by saying, "Peaceably if you can, forcibly if you must." Such is the trend of decisions in this country. The conclusions of the court in this case, I think, are fully sustained by the Supreme Court of the United States in Allison v. United States, 160 U. S. 203–216, 16 Sup. Ct. 252, 257, 40 L. Ed. 395. In that case the court holds that a "slight movement

may be sufficient to justify instant action." In the case of Allen v. United States, 164 U. S. 493, 17 Sup. Ct. 154, 156, 41 L. Ed. 528,· the Supreme Court holds that, in a case of homicide, a person committing homicide must be surrounded by such circumstances as would "lead a reasonable person to believe that his life is in peril." In the case of United States v. Jailer of Fayette County, 2 Abb. (U. S.) 265 and 280, Fed. Cas. No. 15,463, which was somewhat analogous to the one we have under consideration, and in which the court discussed at some length all of the authorities, both ancient and modern, bearing upon the subject, the court reached the conclusion that all it had to do was to ascertain whether the officer in that case did what was done in pursuance of a law and process of the United States, and, so justified, not excused, by that law and process, reached the conclusion that it was because he was authorized and justified by the law and process under which he acted to do all that he did.

The court reaches the conclusion that Laing and Hurt were summoned by a deputy marshal, Cunningham, and were attempting to arrest Harless for a violation of the laws of the United States, and, while so acting under the authority of the law, were authorized and justified in using whatever means were necessary to execute the process of the court; and that if they believed, in the execution of the process, that it was necessary, to save their lives or protect themselves from great bodily harm, to take the life of Harless, and they had reasonable grounds for such belief, the law will hold them harmless of homicide, upon which they stand indicted in the court of Raleigh county, W. Va. Reviewing all the facts and circumstances which surround the killing of Harless by Laing and Hurt, the court is of the opinion that the petitioners are in custody of the state authorities in violation of their rights as citizens under the Constitution and laws of the United States, and, for the reasons assigned, that they should be discharged. An order will be entered that the petitioners be discharged from further custody, and the clerk of the court will furnish the circuit court of Raleigh county with a copy of the opinion and order of the court.